WILLIAM H. ULMER vs. P. McDONNELL.

Sale—Action for Price—Evidence.

The plaintiff, who is a contractor and dealer in cut stone, sues to recover a balance claimed to be due upon an alleged sale of stone curbing delivered to the defendant, to be used in connection with the latter's contract for paving the streets of Grand Forks. The defendant denies having purchased the curbing, and alleges that his contract with the plaintiff was merely to take the curbing from the cars and set it in place on the streets. The case was tried to the court without a jury. The trial court found that there was no sale of the curbing to the defendant, and that the defendant's contract was merely one of employment, as alleged by him, and rendered judgment accordingly. Upon plaintiff's appeal from the judgment, and a review of the entire case in this court, the findings and conclusions of the trial court are sustained, and the judgment affirmed.

Appeal from District Court, Grand Forks County; *Fisk*, J.

Action by William H. Ulmer against P. McDonnell. Judgment for plaintiff, and he appeals. Affirmed.

*Cochrane & Corliss,* for appellant.

*George A. Bangs,* for respondent.

YOUNG, J. In this action, plaintiff has appealed from a judgment entered in the district court in his favor, and demands a trial anew in this court of the entire case. The complaint, for a first cause of action, states that in September, 1898, the defendant and plaintiff entered into an agreement whereby plaintiff agreed, out of materials to be furnished by himself, to manufacture, sell, and deliver to defendant on the cars at Grand Forks, N. D., 42,000 running feet of stone curbing, at the agreed price of 43 cents a foot; that under said agreement the plaintiff delivered to defendant, and defendant accepted, 26,656 feet of said stone curbing, worth, at the agreed price, $11,462.08, and that on account of said sale and delivery the defendant has paid the sum of $9,470.60, and that the balance due plaintiff is $1,991.48. For a second cause of action, the complaint charges, in effect, that defendant has wrongfully refused to receive or accept any of said curbstone over and above said amount of 26,656 feet, despite the fact that plaintiff was able and willing to deliver the same, and has repeatedly offered to deliver the same, and that, by reason of the defendant's refusal to accept all of the stone so sold, plaintiff has been damaged to the amount of his prospective profit, which is alleged to have been 26 cents per foot on 15,344 feet. "Plaintiff further alleges that he is engaged in the business of manufacturing curbing and building stone; that the capacity of his plant is limited, and that, by reason of the large contract which he had taken to deliver to defendant the said curbing, he was compelled to enlarge his plant for the special purpose

of filling the said contract, and was also compelled to decline to take other contracts during the seasons of 1898 and 1899; and that, in consequence thereof the plaintiff was damaged in the sum of $4,000 through the failure of said defendant to perform said contract,"— and prays for judgment in the sum of $12,589.40, with interest and costs. Defendant answered the complaint, denying every allegation thereof, and, by way of counterclaim, defendant alleged: That in the month of September, 1898, the plaintiff and defendant entered into a contract whereby the defendant agreed to take from the cars in the city of Grand Forks, and to there set in place, any and all W. H. Ulmer Dunville sandstone curbing shipped by the plaintiff to the city of Grand Forks as curbing to be used in connection with the paving to be done in said city. That for such service the plaintiff promised and agreed to pay defendant the sum of 8 cents per lineal foot. That under said contract the defendant hauled and set in place 22,789.6 feet of said curbing, which services were of the agreed value of $1,822.92. That in addition to the above services, the defendant rendered the plaintiff the following services under said contract, reasonably worth the sums as hereinafter set forth; to-wit: Hauling 3,869.4 lineal feet from cars to street, at 2 cents per foot, $77.39; setting in place 1,764 lineal feet, at 6 cents per foot, $105.84; taking out and replacing curbing and repairing paving and back-filling 700 feet of curbing, at 15 cents per foot, $105.00; taking out 1,064 feet after being set, at 2 cents per foot, $21.92; taking up, hauling, and piling of all rejected curbing, 3,869.4 lineal at 4 cents per foot, $154.77; making, in all, a total sum of $2,287.84. That no part of said sum has been paid, save and except the sum of $2,154, and that there is now due to the defendant the sum of $133.84, for which sum the defendant demands judgment. Briefly stated, the plaintiff's claim is that he sold the 42,000 feet of curbing in question to the defendant at an agreed price of 43 cents per foot. The defendant, on the other hand, denies that he purchased any of said curbing, and alleges that his contract was simply to transport it from the cars, and set it in place on the streets of Grand Forks, for an agreed compensation of 8 cents per foot. The case was tried to the court without a jury. Evidence was offered in support of the allegations of the complaint and answer. No testimony was offered by plaintiff in rebuttal, as against the items of the defendant's counterclaim. The trial court found against the plaintiff, and held that the defendant's contract with plaintiff was one of employment, to take the stone from the cars and set it in place, as pleaded in the answer, and allowed to the defendant the sum of $1,822.92 for transporting and setting the stone in place, and allowed upon the other items of the counterclaim the sum of $275.94, and, after charging him the sum of $2,154, which had admittedly been paid to him by the city of Grand Forks, in the form of paving warrants, awarded judgment against him for the difference, $55.15 and costs of the action.

It is undisputed that the plaintiff shipped 26,656 feet of stone to Grand Forks, and that the defendant took the same from the cars, and set in place on the streets 22,186 feet. The rest of the stone is piled up at Grand Forks, and has not been set in the streets, except about 600 feet, which amount, after being set in place, was taken up by the defendant under the direction of the city council.

The decisive question for determination in this case is whether the stone in question was sold to the defendant, as plaintiff claims, or whether the defendant was merely employed to transport the stone from the cars, and set it in place, as alleged by him. The trial court found, as we have seen, that the defendant's contract was one of employment only. The majority of the court, after a careful review of the testimony, have reached the same conclusion. The contract between plaintiff and defendant was not reduced to writing. It is agreed that whatever contract was made was entered into at a single conversation which occurred between them at Grand Forks at a time when paving contracts were being let. This conversation occurred under the following circumstances: The city of Grand Forks had decided to grade, pave and curb certain streets, and, with a view to letting a contract therefor, had advertised for bids, to be based upon specifications of the items of the work to be done, which included the paving, excavating, and curbing required; the curbing being estimated at 42,000 lineal feet. Both plaintiff and defendant filed bids. The defendant's bid was for all the work, including excavating, paving, and curbing. His bid on the curbing covered two different kinds of stone,—one for 70 cents per foot, and the other for 74 cents per foot. The plaintiff's bid was for curbing alone, and included two kinds of stone,—one for Mankato limestone, at 58 cents per foot, and the other a sandstone curbing, at 51 cents per foot. At the time of making his bid, plaintiff presented to the city council a sample of the sandstone which he proposed to furnish. The bids were opened on September 19, 1898, and, after being considered, the city council appointed a special committee to consider the same, and to report on the following day. Both the plaintiff and the defendant appeared before this special committee. On the following day, the 20th, the committee reported to the council in writing as follows: "We * * * recommend that the contract for paving and curbing be awarded to P. McDonnell, provided he will agree to put in fifteen to twenty blocks of pavement before November 5, 1898. We further recommend that the Dunville sandstone be used for curbing at fifty-one cents per foot, or wood curbing at twenty-five cents per foot." On the same day the city council passed a resolution to the effect "that the contract for paving and curbing be awarded to P. McDonnell at the price named in his bid for cedar-block pavement, without tile, and that the Dunville sandstone be used for curbing, at fifty-one cents per foot." It is shown that the city council, as well as the special committee, were satisfied with Mr. McDonnell's offer as to the grading and paving, and that they were anxious that he should have the

contract, but they were equally anxious that the plaintiff's curbing should be used. It was therefore important, from the city's standpoint, that the plaintiff and defendant should reach an agreement whereby the city could get it. The special committee of the city council therefore urged the plaintiff and defendant to get together and come to an understanding. In pursuance of this request, they retired to a hall outside of the committee room, and it was at this place and time that the conversation in question occurred. After the conversation, they returned to the committee room and reported their agreement to the committee. The testimony of the parties as to what the conversation was is in conflict. The plaintiff testified as follows: "The bids were opened there. Mine was opened and read, and defendant's bid was opened and read. The matter was referred to a special committee, and I attended a session of that committee next day. Mr. McDonnell also was present. In relation to that committee, they had me in there to discuss with me the quality of the stone,— fix up a deal where I could furnish Mr. McDonnell the stone; and we talked it over (me and Mr. McDonnell) for quite a while there, and I agreed to deliver him this stone at forty-three cents a foot f. o. b. cars Grand Forks; and he finally agreed with that committee, I guess, to go on and take the work, and they so reported, and he got the contract that evening. * * * I think that me and Mr. McDonnell had the talk in the hall. * * * That is the substance of the whole talk between me and Mr. McDonnell until after they had a meeting that night, and after they awarded him the contract he wanted to know if I could get out stone fast enough. He wanted to put in fifteen or twenty blocks that fall. I told him I would certainly do all I could,—I would put in electric light and work day and night,—and went to the quarry and got the derrick up and got the stone started." On cross-examination, plaintiff said: "He wanted to know what I would allow him for setting it, and I told him that I would allow him 8 cents a foot, delivered on the cars here. Our agreement was I should get 43 cents per foot for the stone f. o. b. Grand Forks, here, and my contract expired at that time,—he to take and put it in the ground,—and I don't know what he got. I mean to say that I don't know what Mr. McDonnell got for putting that stone into the ground. I told him I would do it for 43 cents. My price was 51 cents; that including the setting of it in the ground. What I mean by allowing him 8 cents a foot is that I took that 8 cents from my contract price, and he was to pay me 43 cents." Testifying as to payment, plaintiff said: "He wanted to know if I could use any warrants, and I told him I could. He was to pay me as he was paid by the city, and in city warrants. He turned over city warrants to me and some cash." The defendant testified, after stating that he did not at any time agree to purchase the stone or any stone from the plaintiff, that: "Then I wasn't going to take the contract, because I didn't get in my own stone,—his stone wouldn't be leaving me any profit; so they had a special meeting in Mr. Clifford's office,

and called Mr. Ulmer and myself there. Then I told them that I couldn't hardly care to take Mr. Ulmer's stone; and I think it was Mr. Turner said: 'Well, we will have to throw all the bids out and readvertise,' or some such thing. So there was some other member of the committee spoke up and said, 'You and Mr. Ulmer are here, and why not go outside and talk the thing over, and see if you can come to some conclusion?' Or before we went out I said I couldn't take the contract. They wanted me to take the contract, and let Mr. Ulmer take the curbing. I told them I didn't think I could do that. Finally, then, some one suggested for him and I to go outside and talk it over; so we stepped outside of the committee room, and I asked him what he would allow me a foot to take that from the cars and set it in place. He told me he would give me eight cents a foot. I told him that wouldn't leave anything in it for me,—it would cost more than that to put it in; but I said I would do it for ten cents or twelve cents. 'No,' he said, 'that is my price. It is all right, and you have to take it for that.' So I finally agreed to take it from the cars and set it in the street for eight cents a foot, and I was to pay him as I got paid from the city for what I put in the street, and give him the city engineer's estimate as I got that. That is practically all the contract Mr. Ulmer and I had, that I remember of. That was all that was talked over. There was no other contract. That was all the contract there was. Then we went back to the committee and told them what we done, and so on; and then, in conclusion, the committee awarded me the contract. Mr. Ulmer was to take the warrants, the same as I got, and I should pay the same as I got; but afterwards there was some time I disposed of warrants, and I could do that, and it was an accommodation to him, and I gave him some money, instead of warrants, as I was getting rid of the warrants."

It will thus be seen that their testimony is in square conflict. The plaintiff testifies, in effect, to a contract for the sale of stone to defendant. The defendant, on the other hand, explicitly denies any conversation from which a contract of sale might be deduced, and narrates in detail a conversation which, if it occurred, establishes the transaction as one of employment and agency on his part. This court is unanimous in the conclusion that, if there was no other evidence in the case than that above quoted, the plaintiff would necessarily fail, for the reason that he has failed to sustain the burden of proof necessary to establish his cause of action. The case is one in which resort must be had to surrounding facts and circumstances for the purpose of determining where the truth lies. From a consideration of such facts and circumstances, the court has reached the conclusion that the defendant's contract was one merely of employment, and that the finding of the trial judge, who had the superior advantage of hearing the testimony as it fell from the lips of the witnesses, was entirely correct, and must be sustained. Conclusive evidence to that effect is afforded by the conduct of the parties themselves. As we have seen, they reported their oral ar-

rangement to the city authorities. As soon as they reported such agreement, and it was settled that plaintiff's curbing would be used, the plaintiff left for his home, in St. Paul. On the following day, the city authorities, to whom the agreement had been reported, caused the city attorney to prepare a written contract for the paving, curbing, and grading in question, and the same was signed by the authorities of the city and by McDonnell. The contract was prepared with great care, and includes recitals of the advertisement for bids, and a statement of the bids submitted, with prices for the various kinds of paving and different kinds of curbing. In said contract, McDonnell. agrees to furnish all labor and materials to complete the contract; and it is provided that all work shall be done under the direction of the city engineer, and that all material furnished shall be subject to the approval of the city engineer. The contract further provides "that all curbing shall be done with the W. H. Ulmer Dunville sandstone, unless otherwise directed by the city council," and the right is reserved to change this curbing and use other curbing upon 10 days' notice. The amounts to be paid for the different kinds of paving and kinds of curbing are stated separately and in detail, and it is agreed that payments due upon the contract shall be made in paving warrants issued from time to time upon semi-monthly estimates of the work done, as made by the city engineer. The defendant's relation to the plaintiff and to the city in reference to the curbing which plaintiff had induced the city to accept for paving purposes, is clearly defined in the following provision, which is inserted in the contract in question: "It is further stipulated that the party of the second part [McDonnell] shall not be held responsible in any way to the city of Grand Forks for the furnishing and delivery from the quarry to the station in the city of Grand Forks of the W. H. Ulmer Dunville sandstone curbing mentioned in the proposal and in this contract, or for the durability of said sandstone; it being the intent hereof that the party of the second part shall be responsible to the city of Grand Forks only for the delivery of said stone from the cars in the city of Grand Forks to the place of work, or using the same, and for the proper setting of the stone." It is patent, in view of the provisions of the contract just quoted, that McDonnell did not sell or contract to sell the stone in question to the city; and it is absurd to believe that he would enter into this contract, wherein, as we have seen, the city reserved the right to use other than the Dunville sandstone, if he had in fact, as plaintiff contends, not 24 hours previously, bought outright 42,000 feet of plaintiff's stone, which might or might not be received, at the city's option, involving a personal obligation of $18,000. It is both improbable and absurd. It is true, Ulmer did not sign this contract, and was not present when it was executed, but it was made between the city authorities and McDonnell almost immediately after the plaintiff and McDonnell had reported to the city council what their agreement was; and it is entirely reasonable to

infer that the written stipulation in reference to the defendant's relation to the stone truly represents the agreement which the parties made and reported to the city council. Further, there is not a single suggestion or circumstance disclosed in the entire record even tending to show that McDonnell at any time has in any way treated his contract with the plaintiff as being in any respect different from that testified to by him. The plaintiff's conduct also negatives the idea of a sale to McDonnell. No such claim was made by him until this action was commenced, in December, 1899. Not only was no claim made by him that he had sold the stone to McDonnell, but his conduct has been inconsistent with a sale. This is shown by numerous acts, some of which we will mention: In December, 1898, some of the stone which had been delivered and was upon the streets of Grand Forks could not be used because of the extreme cold weather. It is undisputed that the plaintiff paid McDonnell $12.50 for taking care of it. The reason given by plaintiff is that he did this "because he did not want it piled up outside." This exercise of the right of ownership after it was unloaded does not harmonize with his present claim that he sold it to McDonnell f. o. b. cars Grand Forks. Again, it appears that at all times prior to the commencement of this action, the plaintiff looked to the city for his pay. On July 2, 1899, he wrote to McDonnell as follows: "Get as big an estimate as you can on the work to-morrow night, and send it to me as soon as possible, so I can pay the men and freight. We have got up there now 27,000 feet of curb altogether,—what I shipped this fall and last spring." And again, on September 1, 1899, he wrote to McDonnell: "I wish, as soon as you get the estimate, that you would send me a check before the 10th of the month, as it is my pay day, and I am figuring on getting the money from you for the same." As the work progressed, the plaintiff was paid by paving warrants, which were transmitted by McDonnell, issued upon the estimates made by the city engineer. In some instances McDonnell disposed of the warrants, and sent cash instead, for Ulmer's accommodation. It appears that in 1899 objection was made, by property owners upon whom the burden of payment ultimately rested, to the plaintiff's stone, and upon petition from such owners the city council decided to use other stone for curbing, under the right reserved in the contract to make such change. McDonnell notified the plaintiff not to ship any more stone. Upon receiving this notice, Ulmer made no demand upon McDonnell for a settlement or for payment. Neither did he claim that McDonnell had agreed to purchase either the stone then delivered, or the entire 42,000 feet, as he now claims. The evidence shows that the plaintiff, upon the rejection of his curbing, came to Grand Forks and employed as counsel the firm of Cochrane & Corliss; and, after stating the facts to them, said firm, under date of October 31, 1899, wrote to the defendant the following letter: "P. McDonnell, Esq., City—Dear Sir: Mr. Ulmer was here yesterday, but failed to find

you; and, as he was unable to remain, he has left his matters in our hands to look after. He says there is some money in your hands which he wishes paid at once, as he is in need of money himself. Will you kindly call at the office at your earliest convenience, and see us about this matter, so that we can understand just what the situation is." This demand plainly proceeds upon the ground that McDonnell then had in his hands money which he had received from the city, which Ulmer claimed belonged to him, and a position which is utterly inconsistent with the present claim that the stone was ·sold to McDonnell, and that the latter owed Ulmer for it. The evidence shows that thereafter,. and on November 19, 1899,· the sum of $392.50 was paid to Cochrane & Corliss by McDonnell for the plaintiff, pursuant to the above demand. Again, John Dinnie, the mayor of Grand Forks, testified that the plaintiff informed him that "he would hold the city for the stone, and that he would sue the city for the difference in the stone,—the stone that he did not use,"—and that he did not remember that plaintiff mentioned any demand or claim against McDonnell. The plaintiff does not deny having this conversation with Dinnie. He says: "I might have had a conversation with Mr. Dinnie with respect to this contract. I told him I should try to hold McDonnell, and, if I could not, I should hold Grand Forks; that I should hold Mr. McDonnell and the city of Grand Forks both, if I could. I qualified myself in that way. At that time I guess I had a conversation with Mr. Turner in respect to this matter, and told· him I intended to sue McDonnell and the city of Grand Forks. That was before I consulted Judge Corliss. After I consulted with him, I concluded to sue McDonnell. He said my contract was with McDonnell, and I sued." It thus appears that the present theory of the sale of the stone to McDonnell was born of the exigency in which the plaintiff found himself upon the rejection of his curbing by the city, and this is less than one month before this action was commenced. It goes without saying that if plaintiff had sold the stone to McDonnell, as he now claims (the transaction involving something like $18,000), he would have known that fact. In addition to the convincing effect of evidence which we have recited, due weight must also be given to the fact that the plaintiff's theory of a sale to McDonnell is utterly improbable. It is conceded that there was no profit whatever for Mc-Donnell in connection with the curbing, and a probably loss, and this fact was known to all parties when the arrangement between the plaintiff and defendant was made, whereas it appears, and the plaintiff alleges, that his profit upon the stone, after allowing 8 cents per. foot for setting it in place, was 26 cents per foot, or an alleged profit of $10,920 on the entire 42,000 feet. It is absurd to conclude that a man of ordinary prudence, under such circumstances, would buy the stone outright, and this at a time when he had no contract with ·the city, and then immediately enter into a contract with the city, in which the city reserved the right to use other stone, as was

done in this case. It is usual for the person having the profits of a sale to bear the burden of such losses as are incidental to a rejection of the property sold. Plaintiff has entirely failed to show a sale to McDonnell, and consequently cannot look to him to recoup his loss. What the plaintiff's rights are as to the city, we need not discuss or determine. The city is not a party to this action. It is sufficient for the purposes of this case to say that the defendant did not agree to buy the tone, and that his contract with the plaintiff was merely to transfer the stone and set it in place, as alleged in the answer and found by the trial court.

Counsel for appellant does not specify in his brief that any items of the counterclaim as found and allowed by the trial court for removing and piling up the rejected stone were erroneously decided. We assume, therefore, in the absence of such specifications, which are required by rule 12 (74 N. W. Rep. viii) of the revised rules of this court, that the items were correctly found. The entire argument of appellant's counsel goes to the character of the contract.

Having reached the conclusion that the defendant did not buy the stone, but that the contract was merely one of employment, it follows that the judgment of the trial court must be affirmed, and it is so ordered. All concur.